[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 3, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-13739

_____

D. C. Docket No. 06-00103-CV-HLM-4

MICHAEL J. WARSHAUER,

Plaintiff-Appellant,

versus

HILDA SOLIS,
United States Secretary of Labor,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 3, 2009)

Before WILSON and ANDERSON, Circuit Judges, and GOLDBERG,* Judge.

_____

*Honorable Richard W. Goldberg, United States Court of International Trade, sitting by
designation.

WILSON, Circuit Judge:

This appeal requires us to engage in an interpretation of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA" or "Act"), and examine the Secretary of the United States Department of Labor's ("Secretary") authority under it. The case concerns certain website advisories the Secretary issued regarding reporting obligations under the Act, and the extent to which a designated legal counsel ("DLC") must file annual reports of payments the DLC makes over a designated dollar amount to a union or union officer or employee. A DLC is an attorney recommended by a labor union to its members for representation in personal injury lawsuits, who usually does not play a role in labor relations and is not in an actual or potential bargaining relationship with the labor organization. Our consideration of the plain language of the LMRDA leads us to conclude that the Secretary's interpretation is not arbitrary and capricious, such that the appellant, Michael Warshauer, a DLC, is required to file the annual reports. We also find that the Secretary was not required to engage in notice and comment rulemaking when she issued the website advisories.

## I. BACKGROUND

A. *Relevant LMRDA Provisions*

Finding that "there ha[d] been a number of instances of breach of trust,

corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct," in 1959 Congress enacted the LMRDA to protect the rights of employees and the public. 29 U.S.C. § 401(b). An important component of this protection were reporting requirements which would shed light on certain financial transactions. The instant case concerns one of these reporting requirements: § 203 of the LMRDA.

Section 203(a)(1) of the LMRDA requires the filing of a financial report from "[e]very employer who in a fiscal year made—(1) any payment or loan, direct or indirect of money or other thing of value (including reimbursed expenses), or any promise or agreement therefor, to any labor organization or officer. . . ." 29 U.S.C. § 433(a)(1).

Section 203(a)(1)'s reporting requirement applies only to "employers." The LMRDA defines an "employer" as:

> [A]ny employer or any group or association of employers engaged in an industry affecting commerce (1) which is, with respect to employees engaged in an industry affecting commerce, an employer within the meaning of any law of the United States relating to the employment of any employees. . . .

29 U.S.C. § 402(e).

To implement the LMRDA, Congress authorized the Secretary "to issue, amend, and rescind rules and regulations prescribing the form and publication of

3

reports required to be filed under this [subchapter] and such other reasonable rules and regulations . . . as [the Secretary] may find necessary to prevent the circumvention or evasion of such reporting requirements." 29 U.S.C. § 438.

B.      *Relevant Department of Labor Regulations*

In 1963, the Department of Labor promulgated regulations to implement the employer reporting requirements of the LMRDA, specifying that "every employer required to file an annual report by section 203(a) of the Act and § 405.2 shall file such report on the United States Department of Labor Form LM-10 . . . in the detail required by the instructions accompanying such form and constituting a part thereof." 29 C.F.R. § 405.3. The Instructions require employers to report only "certain transactions":

> Only those employers as defined in the [LMRDA] who have been involved in certain financial transactions or arrangements with labor organizations, union officials, employees, or labor relations consultants, or who have made expenditures for certain objects relating to employees' or unions' activities.

The Instructions also exempt from reporting "sporadic or occasional gifts, gratuities, or favors of insubstantial value, given under circumstances and terms unrelated to the recipient's status in a labor organization; e.g., traditional Christmas gifts."

The LMRDA Interpretive Manual ("Manual") was also published in 1963, giving guidance on implementing the statute and regulations. Like the

4

Instructions, the Manual explained that certain payments need not be reported. It used a discretionary "subjective standard" to determine what payments qualified as of "insubstantial value," requiring that "each case . . . be considered on its own facts." The Secretary's decision not to enforce the reporting requirements for payments of "insubstantial value" is known as the *de minimis* exemption.

Warshauer introduced testimony of former Department of Labor officials, suggesting that historically the Secretary interpreted the LM-10 reporting requirement to apply only to employers who engaged in persuader activities.[1] Moreover, it is clear that historically, "insubstantial value" was determined on a case-by-case basis, rather than a fixed dollar amount. The issues in this case arose when the Secretary allegedly departed from these historical practices by publishing advisories on her website regarding the application of § 203(a)(1) to DLCs and the *de minimis* exemption.

C.    *Website Advisories*

In 2005, the Secretary issued website advisories pertaining to Form LM-10 filers. A list of rules, called "Frequently Asked Questions," or "FAQs," detailed the reports to be filed, records to be kept, and calculations to be made annually by

---

[1] The Secretary disputes this claim, and the former officials do not point to any evidence demonstrating that their interpretations of the reporting requirements were expressed in a legally binding fashion, such as a regulation.

employers. In November 2005, the Secretary posted an FAQ, which specifically identified DLCs as falling within the definition of "employer" under the LMRDA, essentially directing DLCs to file the LM-10. Another FAQ stated that the *de minimis* rule for exempting transactions of "insubstantial value" from reporting would depend on a fixed dollar amount. In March 2006, the website announced that the fixed amount was $250—"gifts and gratuities with an aggregate value of $250 or less provided by an employer will be considered insubstantial for the purposes of LM-10 reporting."

The Secretary published these website advisories without giving notice to the public or offering an opportunity for public comment.

D.    *Application to Warshauer*

Michael Warshauer, an attorney who practices in Atlanta, Georgia, specializes in actions under the Federal Employers Liability Act ("FELA"). A rail labor union, the United Transportation Union ("UTU"), appointed him as a DLC. As a DLC, the UTU recommends Warshauer to its members for representation in workers' compensation cases, personal injury cases, and other matters. Warshauer offers this legal counsel to UTU members at a reduced fee of 25% of the recovery. Warshauer engages in normal business entertaining of potential UTU clients.

In October 2002, the Department of Labor sent Warshauer a letter informing

him that "payments made or promised to the UTU, . . . either directly or indirectly, by each DLC that is an 'employer' within the meaning of section 3(e) of the LMRDA, must be disclosed on Employer Report, Form LM-10, in accordance with the statute and with Department of Labor Interpretive Regulations. . . ." However, Warshauer did not file the Form LM-10, based on his belief that he does not qualify as an "employer" under § 203(a)(1) of the LMRDA.

C.    *Procedural History*

Warshauer filed the present action under the Administrative Procedure Act ("APA") seeking to enjoin the Secretary of Labor ("Secretary") from enforcing reporting requirements under § 203(a)(1) of the LMRDA without the Secretary first engaging in notice and comment rulemaking. He also sought declaratory relief invalidating such reporting requirements with respect to DLCs and the Secretary's website advisories regarding the *de minimis* exemption.

After discovery, both parties filed motions for summary judgment. The district court granted the Secretary's motion. The court held that the website advisories regarding both coverage of DLCs and the $250 threshold for reporting were interpretive guidance, not substantive rules, and thus, even if they departed from the Secretary's prior interpretation, notice and comment rulemaking was not required. In the alternative, the court held that even if it were to rule that notice

7

and comment rulemaking was required, the evidence viewed in the light most favorable to Warshauer "fails to support a determination that the Secretary departed from previously-established official policy" regarding either reporting by DLCs or the *de minimis* exemption. It also ruled that the Secretary's interpretation of the term "employer" reflected the plain meaning of the statute and thus was not arbitrary and capricious. The court held that the Secretary's interpretive guidance was entitled to respect under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and therefore should be upheld under the APA.

## II. STANDARD OF REVIEW

"[W]e review the district court's grant of summary judgment *de novo*, with all facts and reasonable inferences therefrom reviewed in the light most favorable to the nonmoving party." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (citation omitted). We review questions of statutory interpretation *de novo*, although an agency's interpretive guidance construing a statute is entitled to deference "proportional to its power to persuade." *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (internal quotation marks and citations omitted). In APA actions, we review agency determinations under the "arbitrary and capricious" standard, which "provides the reviewing court with very limited discretion to reverse an agency decision." *City of Oxford v. FAA*, 428 F.3d 1346, 1351 (11th

8

Cir. 2005).

## III. DISCUSSION

Warshauer argues that (1) the Secretary's advisories requiring DLCs to file Form LM-10s depart from the plain language of the Act and statutory purpose as articulated in its legislative history; (2) the Secretary's advisories exceeded her authority under § 203(a)(1) of the LMRDA; and (3) the application of the Form LM-10 reporting requirement to DLCs and the setting of a $250 threshold for the *de minimis* exemption require notice and comment rulemaking.

A. *Application of § 203(a)(1) to DLCs*

The Secretary interprets the reporting requirements in § 203(a)(1) as applying to DLCs who made payments to unions or union officials. The district court agreed, holding that the Secretary's interpretation reflected the plain language of the statute. On the other hand, Warshauer argues that § 203(a)(1) applies only to employers in actual or potential bargaining relationships with unions.

"The starting point in statutory interpretation is the language of the statute itself." *Ardestani v. INS*, 502 U.S. 129, 135 (1991) (internal quotation marks and alterations omitted). If the "language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," and "the statutory

9

scheme is coherent and consistent," the inquiry is over. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (internal quotation marks omitted). In determining whether a statute is plain or ambiguous, we consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341.

The plain language of § 203(a) applies to all employers who made non-exempt payments. Contrary to Warshauer's suggestion, it contains no requirement that the employer participate in persuader or other labor relations activities. The statutory definition of "employer" includes any employer under any federal law. 29 U.S.C. § 402(e) (defining an "employer" as "an employer within the meaning of any law of the United States. . . ."). As such, under the plain language of the LMRDA, § 203(a)(1) covers all DLCs who are employers, without qualification.

The context of the statute is consistent with the plain language. Section 203(a) consists of five subsections. Each describes a category of circumstances under which employers are subject to reporting requirements. Later subsections of § 203(a) expressly apply only to circumstances in connection with persuader activities. Similarly, § 203(b) explicitly applies to those who make agreements with employers to conduct persuader activities. In contrast, § 203(a)(1) contains no such limitation, leading us to the conclusion that Congress intended not to

10

include such a limitation. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"). While Congress certainly knew how to include language referring to persuader activity, as it drafted such a qualification later in the statute, it declined to do so in § 203(a)(1).

The broader context of the statute as a whole gives us some pause. Congress' declaration of purposes of the LMRDA demonstrates that primary purposes were to "protect employees' rights to organize [and] bargain collectively" and to "eliminate or prevent improper practices" in the context of labor-management relations. 29 U.S.C. §§ 401(a), (c). There is no doubt that Congress intended to target employers in actual or potential bargaining relationships with labor organizations, exposing those who dissuade employees from exercising their rights to organize and bargain collectively, so that the employees could be aware of that information when listening to the persuader's message. As DLCs often do not play any role in labor relations, applying § 203(a)(1) to DLCs would not serve this purpose.

11

However, the plain language of § 203(a)(1) may reflect Congress' intent to cast light on other types of potential conflicts of interest or corruption that could harm union members. A real-life scenario serves as an example: a conflict of interest could occur where a union appoints a DLC and recommends him to its members only after the DLC has made significant payments to union officials. *See United States v. Boyd*, 309 F. Supp. 2d 908, 910 (S.D. Tex. 2004) (discussing indictments against UTU officials who solicited and collected cash payments from attorneys who sought to become DLCs). Indeed, Congress found "that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct. . . ." 29 U.S.C. § 401(b). Such activity could reach beyond persuader activity.

Although perhaps digressive from the primary purpose of the LMRDA, the Secretary's application of § 203(a)(1) to DLCs is a faithful interpretation of the plain language of the LMRDA. As such, we find that it is not arbitrary and capricious. Because the language of § 203(a)(1) is clear and unambiguous, we need not look to the legislative history. *See CBS Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (internal quotation marks and citation omitted) ("When the import of words Congress has used is clear . . . we

12

need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language."). Moreover, because the Secretary's application of § 203(a)(1) to DLCs reflects the plain language of the LMRDA, we uphold it without examining any alleged change in interpretation of the statute by the Secretary. *See K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988) (quoting *Bd. of Governors, FRS v. Dimension Fin. Corp.*, 474 U.S. 361, 368 (1986)) ("The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress."). [2]

B.      *Notice and Comment Rulemaking*

Warshauer claims that the advisories applying the Form LM-10 reporting requirements to DLCs and setting a numeric threshold for the *de minimis* exemption require notice and comment rulemaking. The Secretary argues that the advisories do not require notice and comment because they are interpretive rules.

Congress directed the Secretary to follow the APA, 5 U.S.C. § 553, when issuing or amending rules and regulations pursuant to the LMRDA. 29 U.S.C. §

---

[2] Warshauer also claims that the Secretary has exceeded her authority under § 203(a)(1) by extending the LM-10 reporting requirement to DLCs but exempting other employers. This argument is without merit. Under the statute the Secretary is given the discretion to make such exemptions. Exercising her discretion to enforce the reporting requirement against DLCs and refraining from enforcing it against others is justified given the special relationship between DLCs and unions. Union members may benefit from evaluating whether a lawyer's designation as legal counsel is based on merit versus based on a financial relationship between the lawyer and union officials.

526.  The APA requires all federal agencies to publish proposed rules in the Federal Register in order to provide the public with notice and an opportunity to comment.  However, notice and comment rulemaking is not required when an agency issues an "interpretive rule."  Courts generally refer to two categories of rules—interpretive rules and legislative rules.  A legislative rule creates new law, rights, or duties.  An interpretive rule, on the other hand, "typically reflects an agency's construction of a statute that has been entrusted to the agency to administer" and does not "*modif[y]* or *add[]* to a legal norm based on the agency's *own authority*."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94-95 (D.C. Cir. 1997) (emphasis in original).  "[T]he distinction between an interpretative rule and a substantive rule . . . likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute."  *Id.* at 94 (internal quotation marks and citations omitted).

The DC Circuit has set out general principles to be used in determining whether a rule is interpretive.  *See General Motors Corp. v. Ruckleshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc).  First, although not dispositive, the agency's characterization of the rule is relevant to the determination.  *Id.*  Second, "[a]n interpretative rule simply states what the administrative agency thinks the statute means, and only 'reminds affected parties of existing duties.'  On the other

14

hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule." *Id.* (quoting *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 n.153 (D.C. Cir. 1979)). The Seventh Circuit has pointed out that "legislative rules have effects *completely independent* of the statute." *Metro. Sch. Dist. of Wayne Twp. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992) (emphasis in original) (internal quotation marks and citations omitted).

1.     *Applying the Form LM-10 Reporting Requirements to DLCs*

Warshauer argues that the Secretary's advisory applying the Form LM-10 reporting requirement to DLCs requires notice and comment rulemaking because it is a new rule that changes the substantive state of the existing law. The Secretary argues that notice and comment is not required because the advisory is an interpretive rule that merely states what the Department of Labor thinks § 203(a)(1) means.

The rule applying the Form LM-10 reporting requirements to DLCs is an interpretive rule. First, it is relevant that the Secretary characterizes the rule as interpreting § 203(a)(1). Second, the Secretary's interpretation is drawn directly from the plain language of the statute. *See supra* Part III.A. (discussing the plain language of § 203(a)(1)). Third, the rule "only reminded affected parties of existing duties" required by the plain language of the statute. It did not create any

15

new law, right, duty, or have any effect independent of the statute. Thus, the rule "is a prototypical example of an interpretive rule issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)) (internal quotation marks omitted). *See also Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993) ("A statement seeking to interpret a statutory or regulatory term is . . . the quintessential example of an interpretive rule."). The Secretary was authorized not to create a duty for DLCs but to *explain* the duty created by § 203(a)(1).

Having established that the rule is interpretive, we turn to Warshauer's second argument. Warshauer relies upon a line of cases originating in the DC Circuit, which take the following position. If affected parties substantially and justifiably rely to their detriment on a well-established, definitive, and authoritative interpretation of an agency regulation, then the agency must use the notice and comment process before adopting an inconsistent interpretation because "the agency has in effect amended its rule." *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999); *see also MetWest Inc. v. Sec'y of Labor*, 560 F.3d 506, 509-11 (D.C. Cir. 2009); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997). The Fifth Circuit has adopted the *Alaska*

16

*Professional Hunters/Paralyzed Veterans* approach, *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 (5th Cir. 2007), and the Eighth and Third Circuits have mentioned this approach in dicta, *see Minnesota v. CMS*, 495 F.3d 991, 996-97 (8th Cir. 2007) (dicta); *SBS Inc. v. FCC*, 414 F.3d 486, 498 (3d Cir. 2005) (dicta).

However, some tension exists between the several circuits that have addressed this issue. The First, Second, Fourth, Sixth, Seventh, and Ninth Circuits agree that changes in interpretations do not require notice and comment because both the original and current positions constitute interpretive rules.[3] *Miller v. California Speedway Corp.*, 536 F.3d 1020, 1033 (9th Cir. 2008); *St. Francis Healthcare Ctr. v. Shalala*, 205 F.3d 937, 947-48 n.11 (6th Cir. 2000); *Warder v. Shalala*, 149 F.3d 73, 81 (1st Cir. 1998); *Hoctor v. United States Dep't of Agric.*, 82 F.3d 165, 170 (7th Cir. 1996); *Chen Zou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995), *superseded on other grounds by statute*, 8 U.S.C. § 1101(a)(42)(B), *as recognized in Li v. Gonzales*, 405 F.3d 171, 176 (4th Cir.

---

[3] The Eleventh Circuit has not yet adopted either approach. The United States District Court for the Northern District of Georgia once suggested that we had. *See Vencor, Inc. v. Shalala*, 988 F. Supp. 1467, 1471 (N.D. Ga. 1997) ("It is settled that an agency may not adopt rules that reverse or depart radically from its own longstanding policy without invoking the notice-and-comment process."). However, it cites to Eleventh Circuit authority that does not support this proposition. It cites to *Jean v. Nelson*, 711 F.2d 1455, 1476 (11th Cir. 1983), but that case holds that the rule in question is not interpretive and makes no holding about invoking notice and comment when a new rule is interpretive. It also cites to *American Trucking Ass'n v. United States*, 688 F.2d 1337, 1348 (11th Cir. 1982), but that case holds that a series of decisions in discrete cases qualifies as a rule that should be subject to notice and comment and makes no holding about invoking notice and comment when a new rule is interpretive.

2005); *White v. Shalala*, 7 F.3d 296, 304 (2d Cir. 1993).[4]  Because the APA

excepts interpretive rules from notice and comment requirements, "in order for

notice and comment to be necessary, the later rule would have to be inconsistent

with another rule having the force of law, not just any agency interpretation

regardless of whether it had been codified."  *Warder*, 149 F.3d at 81 (quoting *Chief*

*Probation Officers v. Shalala*, 118 F.3d 1327, 1337 (9th Cir. 1997) (brackets

omitted)).

We need not (and do not) take sides in this debate, because we conclude that

Warshauer failed to satisfy even the *Alaska Professional Hunters/Paralyzed*

*Veterans* approach.  Warshauer presents evidence suggesting that the Secretary

chose not to enforce the requirements of § 203(a)(1) against DLCs until the

publication of the disputed website advisory.[5]  However, assuming that such an

enforcement policy existed, it does not rise to the level of a well-established,

definitive, and authoritative interpretation.

---

[4]      Although these cases represent tension with the *Alaska Professional Hunters/Paralyzed Veterans* approach, many have the potential to be distinguished on their facts.  *See Miller*, 536 F.3d at 1030-31 (concluding that the DOJ did not bind itself to a prior definitive interpretation of the regulation at issue); *Warder*, 149 F.3d at 82 ("[W]e very much doubt that the Ruling . . . added something new to [the agency's] policies."); *Hoctor*, 82 F.3d at 170 (addressing only whether a rule was substantive or interpretive)*; Chen Zou Chai*, 48 F.3d at 1336-37, 1341 (considering an "interim rule," in effect for approximately six months).

[5]      Warshauer pointed to affidavits from several former officials from the Department of Labor who persuasively testify that the Department only enforced § 203(a)(1) against employers who made payments designed to influence or protect employees in the exercise of their collective bargaining rights.

Two cases from the DC Circuit are instructive. In *Metwest*, the plaintiff argued that the Occupational Safety and Health Administration ("OSHA") improperly altered its interpretation of a regulation without engaging in notice and comment rulemaking. 560 F.3d at 509. In 1991, OSHA promulgated a regulation prohibiting the removal of contaminated needles from equipment used to extract blood—an action that reflected the development and use of disposal blood tube holders. *Id.* at 508. However, until October 2003, OSHA declined to enforce this regulation against employers who continued to work with reusable blood tube holders. *Id.* at 508-09. First, the court noted that OSHA had never definitively stated that reusable holders were permissible. *Id.* at 509-10. Second, the court held that OSHA had "never established an authoritative interpretation of its regulation on which MetWest justifiably relied. . . ." *Id.* at 511. Finally, the feasibility of the affected parties switching to disposable blood tube holders was clear. *Id.* Accordingly, the court held that "OSHA was not required to engage in notice and comment rulemaking before it ramped up its enforcement of [the regulation at issue]." *Id.* at 511-12.

The DC Circuit's opinion in *Alaska Professional Hunters* provides an appropriate contrast. "Beginning in 1963, the FAA . . . consistently advised [Alaskan] guide pilots that they were not governed by regulations dealing with

19

commercial pilots." 177 F.3d at 1031. Alaskan guide pilots relied on this advice to open and build up businesses. *Id.* at 1035. Then, in January 1998, the FAA published a notice announcing that Alaskan guide pilots would have to comply with all regulations governing commercial pilots. *Id.* at 1033. The DC Circuit later made clear that forced compliance would have driven Alaska's tourism operations out of business. *See MetWest*, 560 F.3d at 511. The FAA's explicit advice, consistently dispensed for over thirty years, represented more than a mere enforcement policy; it rose to the level of a well-established, definitive, and authoritative interpretation upon which the affected parties relied to their detriment. *Alaska Prof'l Hunters Ass'n,* 177 F.3d at 1035. Therefore, the court held that "the agency . . . in effect amended its rule, something it may not accomplish without notice and comment." *Id.* at 1034.

While we express no opinion on the soundness of the decision in *Alaska Professional Hunters*, we conclude that the instant case is analogous to *MetWest*. There is no evidence that the Secretary consistently and explicitly advised DLCs that they were not required to comply with § 203(a)(1). Evidence of the agency's prior enforcement policy—representing mere acquiescence to non-filing—is not sufficient to trigger notice and comment rulemaking.

2.    *The* De Minimis *Exemption and Annual Threshold for Reporting*

20

Warshauer argues that the Secretary's advisory addressing the *de minimis* exemption and setting a $250 threshold for reporting requires notice and comment rulemaking because it imposes new reporting duties and is inconsistent with the Department of Labor's prior applications of the *de minimis* exemption. The Secretary argues that the advisory does not require notice and comment because it is an interpretive rule.

In 1963 the Department published the Instructions to the Form LM-10. The Instructions exempt "sporadic or occasional gifts, gratuities, or favors of insubstantial value" from § 203(a)(1) reporting obligations. The Department did not fix dollar amounts to define "insubstantial value," instead choosing to follow a subjective approach to the exemption. In 2005, the Secretary changed this subjective approach to an objective standard—$250 for everyone.

The Secretary's rule is interpretive. The advisory informs the public about the agency's current view of "insubstantial value" in its application of the *de minimis* exemption; in other words, it merely clarifies how the Secretary intends to enforce the long-standing exemption to the reporting requirement. It does not create any new law, right, or duty, but rather provides guidance as to how the Secretary will exercise her enforcement discretion.

That the rule contains a numeric value does not prevent it from being an

21

interpretive rule. While a rule that turns on a number is likely legislative because it is an arbitrary choice among possible methods of implementing a statute, not every rule with a numeric component is legislative. *Hoctor*, 82 F.3d at 171 ("We are not saying that an interpretive rule can never have a numerical component," as "the use of a number as a rule of thumb to guide the application of a general norm will often be legitimately interpretive."). Here, the Secretary interpreted the phrase "insubstantial value" as $250 or less. Her decision not to enforce the statute against those who make only such trivial payments is within her discretionary power.

Warshauer is incorrect in claiming that the advisory imposed new reporting duties. On the contrary, such duties derive from the statute itself; the advisory simply provides additional guidance. That the Secretary has informed the public of her judgment does not render the rule legislative.

Furthermore, contrary to Warshauer's assertions, the Secretary's change in position on what constitutes "insubstantial value" does not trigger notice and comment procedures. "[S]o long as a new guidance document can reasonably be interpreted as consistent with prior documents, it does not significantly revise a previous authoritative interpretation." *MetWest*, 560 F.3d at 510 (internal quotations omitted). Although the Secretary has set and altered the numerical

22

value of the *de minimis* threshold, the Secretary's advisories may be reasonably interpreted as consistent. There has been no significant departure from or revision of the policy of exempting gifts of "insubstantial value."

Accordingly, since the Secretary's advisory setting a $250 threshold is an interpretive rule, the district court did not err in holding that the Secretary was not required to engage in notice and comment rulemaking.

## IV. CONCLUSION

Because the Secretary's application of § 203(a)(1) to DLCs is a faithful interpretation of the plain language of the LMRDA, we find that it is not arbitrary and capricious. Moreover, the Secretary did not exceed her authority under § 203(a)(1) by extending the Form LM-10 reporting requirement to DLCs.

The district court did not err in holding that the Secretary was not required to engage in notice and comment rulemaking because the advisories applying the Form LM-10 reporting requirements to DLCs and setting a numeric threshold for the *de minimis* exemption are interpretive rules. Although several circuits have indicated that the alteration of a well-established, definitive, and authoritative interpretation may in effect constitute the amendment of a rule and trigger notice and comment rulemaking, the circumstances in the instant case do not fall into that narrow category. Accordingly, we affirm.

**AFFIRMED**.

23