[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 22, 2010
JOHN LEY
CLERK

_____

No. 09-15727

_____

D. C. Docket No. 08-01062-CV-ORL-22-GJK

JORGE J. LEAL,
Jorge J. Leal, M.D.,

Plaintiff-Appellant,

versus

SECRETARY, U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
and his Successors,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
NATIONAL PRACTITIONER DATA BANK,
an Entity of and Run by the U.S.
Department of Health and Human
Services,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 22, 2010)

Before EDMONDSON and CARNES, Circuit Judges, and GOLDBERG,[*] Judge.

CARNES, Circuit Judge:

One day Dr. Jorge J. Leal, a urological clinician and surgeon, was waiting for the operating room at Cape Canaveral Hospital in Cocoa Beach, Florida to become available. It was, as the doctor would later describe it, "a very long day." And not a good one for him. Instead, it appears that, like Alexander in the classic children's story, Dr. Leal was having "a terrible, horrible, no good, very bad day."[1] And at around 6:30 p.m., he was told that his use of the operating room was going to be delayed (for 20 minutes as it turned out). Apparently, that was the final straw for him.

What Dr. Leal did after he was told that he would have to wait to use the operating room led the Hospital to suspend his clinical privileges for a period of sixty days and to file a report explaining why. To summarize, in colloquial terms, that report's description of Dr. Leal's conduct: he pitched a fit. More specifically, the Hospital reported that Dr. Leal became so enraged that he broke a telephone, he shattered the glass on a copy machine, he shoved a metal cart into the doors of the operating suite so hard that it damaged one of them, he threw jelly beans down the

_____

[*] Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

[1] Judith Viorst, Alexander and the Terrible, Horrible, No Good, Very Bad Day (1972).

hallway in the surgical suite, he "flung a medical chart to the ground" when a nurse asked him for written authorization to proceed with surgery, and he "verbally abused a nurse manager" by raising his voice, using profanity, and calling her a liar. According to the report, Dr. Leal's "violent and unprofessional actions" on that occasion "caused various members of the nursing and technical staff to announce [that] they were fearful of working with him in the future."

The Hospital filed its report of the adverse action taken against Dr. Leal with the Secretary of the Department of Health & Human Services, as it felt compelled to do under the Health Care Quality Improvement Act, 42 U.S.C. § 11101 et. seq. The Secretary included the report in the National Practitioner Data Bank, which was set up under the Act "to collect and release certain information relating to the professional competence and conduct of physicians, dentists and other health care practitioners," 45 C.F.R. § 60.1 (2010).

Dr. Leal was unhappy enough about the suspension, and he certainly did not want a report of it in the National Practitioner Data Bank where other hospitals would have access to it. See 42 U.S.C. § 11135(a). He sought the Secretary's review of the report, arguing that it was not factually accurate, and he asked that the report be removed from the Data Bank because the Hospital's action against him was not of the type that should be reported. The Secretary rejected Dr. Leal's

3

assertion that the report was not factually accurate. Relying on documents submitted by Dr. Leal as part of his request for Secretarial review, the Secretary concluded that the report accurately described the Hospital's action and "reasons for action as stated in the [Hospital's] decision documents." The Secretary also refused Dr. Leal's demand to remove the report, explaining that "[t]here is no basis on which to conclude that the report should not have been filed in the [Data Bank]." He did allow Dr. Leal to file a response, a copy of which would be given to anyone who obtained the report itself from the Data Bank. Not happy with that outcome, Dr. Leal filed an action under the Administrative Procedure Act seeking a court order requiring the Secretary to remove the report from the Data Bank. The district court entered a judgment denying relief, and this is Dr. Leal's appeal.

## I.

"In APA actions, we review agency determinations under the 'arbitrary and capricious' standard, which 'provides the reviewing court with very limited discretion to reverse an agency decision.'" Warshauer v. Solis, 577 F.3d 1330, 1335 (11th Cir. 2009) (quoting City of Oxford v. FAA, 428 F.3d 1346, 1351 (11th Cir. 2005)). "The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." Sierra Club v. Van Antwerp, 526 F.3d

4

1353, 1360 (11th Cir. 2008) (quotation marks omitted); see also Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009) (explaining that "[t]he arbitrary and capricious standard is exceedingly deferential" and that this Court is "not authorized to substitute [its] judgment for the agency's as long as [the agency's] conclusions are rational" (quotation marks and citations omitted)).

## II.

In the Health Care Quality Improvement Act, Congress directed the Secretary of the Department of Health & Human Services to promulgate regulations establishing "procedures in the case of disputed accuracy of the information" in the National Practitioner Data Bank. 42 U.S.C. § 11136(2). Under those regulations, a physician who disputes the accuracy of a report can seek Secretarial review, see 45 C.F.R. § 60.16(c)(2), which is limited to having the report reviewed "for accuracy of factual information and to ensure that the information was required to be reported." U.S. Dep't of Health & Human Servs., National Practitioner Data Bank Guidebook F-3 (2001), http://www.npdb-hipdb.hrsa.gov/pubs/gb/NPDB_Guidebook.pdf ("Guidebook"); see also Christensen v. Harris Cnty., 529 U.S. 576, 587, 120 S.Ct. 1655, 1662–63 (2000) (explaining that interpretations contained in enforcement guidelines get

5

Skidmore deference).

Under the regulations, when a physician seeks Secretarial review of a report "the Secretary . . . review[s] the written information submitted by both parties." 45 C.F.R. § 60.16(c)(2); see also Guidebook, at F-3 (explaining that a physician challenging a report's factual accuracy must "[s]ubmit documentation substantiating that the reporting entity's information is inaccurate"). And that happened in this case. To show that the report was not factually accurate, Dr. Leal submitted his own affidavits in which he gave his version of the events that led the Hospital to suspend his clinical privileges. According to those affidavits, he accidentally broke a telephone when he tripped on its long cord; he closed the lid of a copy machine with "some force" and the glass cracked; he moved a metal cart that was blocking the doors of the operating suite; he ate jelly beans, some of which may have fallen on the floor when he tried to throw away flavors that he did not like; and when he was handed a medical chart by a nurse some of the chart's loose papers fell to the floor. In other words, this urological surgeon, who earns his living wielding a razor-sharp scalpel on some of the most delicate parts of the body, does not have a bad temper — he is just clumsy. Dr. Leal did admit in his affidavits, however, that he had on that occasion spoken "sternly" to a nurse who incorrectly told him that his patient was not cleared for surgery. Dr. Leal also

6

submitted to the Secretary letters from the Hospital's administrators to him formally stating that "in the best interests of patient care" his clinical privileges were suspended due to his "violent, threatening and physically destructive and damaging behavior." Based on that documentation, the Secretary determined that the Hospital's report was factually accurate in the relevant sense.

Dr. Leal challenges the Secretary's finding. It is his position that a report is factually accurate only if the administrative record includes statements from eyewitnesses that substantiate the information in a hospital's report about a doctor's misconduct. Without that requirement, he contends that a hospital could unfairly "blacklist" a physician by filing a report in the Data Bank based on conduct that never occurred. Because the Hospital did not submit statements from eyewitnesses to back up what it said about him, Dr. Leal argues that it was arbitrary and capricious for the Secretary to find that the report was accurate.

Dr. Leal's position misunderstands the purpose of the Data Bank and the scope of the Secretary's review. Congress enacted the Health Care Quality Improvement Act, which led to the creation of the Data Bank, after finding that there was "a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101. The Data Bank

7

prevents a physician who applies to become a member of a hospital's medical staff or for clinical privileges from being able to hide disciplinary actions that have been taken against him. See id. § 11135(a)(1) (requiring a hospital to request information from the Data Bank about a physician when the physician applies to be on the medical staff or for clinical privileges). Information in the Data Bank is intended "only to alert . . . health care entities that there may be a problem with a particular practitioner's professional competence or conduct" because the practitioner has been the subject of a disciplinary action. Guidebook, at A-3; see also id. at E-1 (explaining that the "principal purpose [of the Data Bank] is to facilitate a comprehensive review of professional credentials" (emphasis added)); id. at A-3 (noting that the Data Bank "provides another resource to assist . . . hospitals[ ] and other health care entities in conducting extensive, independent investigations of the qualifications of the health care practitioners they seek to . . . hire, or to whom they wish to grant clinical privileges."); id. at E-1 (explaining that the Data Bank serves as a "flagging system"). The Data Bank contains not only the hospital's side of the story but also the physician's response. What the requesting hospital does with the information it obtains from the Data Bank is entirely up to that hospital. It could completely discount the information, or it could back off from any professional relationship with the physician, or it could

8

make further inquiries to determine what had actually happened.

Because information in the Data Bank is intended only to fully notify the requesting hospital of disciplinary action against a physician and the charges on which that action was based, the Secretary's review of information in the Data Bank is limited in scope. The review process does not provide a physician with a procedure for challenging the reporting hospital's adverse action. See id. at F-1 ("The dispute process is not an avenue . . . to appeal the underlying reasons of an adverse action . . . ."); id. at F-3 ("The Secretary does not review the . . . appropriateness of, or basis for, a health care entity's professional review action . . . ."). Nor does it provide a physician with a procedure for changing the allegations about the conduct that led to the action that is reported. The Secretary reviews a report for factual accuracy deciding only if the report accurately describes the adverse action that was taken against the physician and the reporting hospital's explanation for the action, which is the hospital's statement of what the physician did wrong. See 42 U.S.C. § 11133(a)(3)(B) (requiring a hospital to include in the report "a description of the acts or omissions or other reasons for the action"); see also Guidebook, at F-4 (giving as examples of pertinent documentation to prove that a report is not factually accurate: "[t]he findings of fact and recommendations of the health care entity" and "[t]he final report of the hearing panel or other

9

appellate body upon which the description of acts or omissions was based"). The Secretary does not act as a factfinder deciding whether incidents listed in the report actually occurred or as an appellate body deciding whether there was sufficient evidence for the reporting hospital to conclude that those actions did occur. See Guidebook, at F-1 (explaining that the "basis for" the adverse action may not be disputed by the physician).

Dr. Leal's affidavits disputed to some extent the Hospital's version of his conduct. That dispute is outside the scope of the Secretary's review. See id. The letters to Dr. Leal from the Hospital's administrators, which he submitted to the Secretary, confirmed that his clinical privileges were suspended, and they confirmed that the reason for the suspension was that the Hospital believed he had engaged in "disruptive" and "violent, threatening and physically destructive and damaging behavior." The information in the report was consistent with the charges outlined in the Hospital's letters to Dr. Leal. The report stated that his clinical privileges were "summarily suspended . . . due to his violent and unprofessional actions" and also stated in some detail what those actions were. The consistency between the Hospital's letters and its report to the Data Bank establishes the report's factual accuracy in the only sense that matters under the Act. The Secretary reasonably determined that the report was factually accurate in that

10

sense.

As for Dr. Leal's concern about an unscrupulous hospital filing a report based on conduct that never occurred and blacklisting a physician, we have three things to say. First, the requesting hospital is free to ignore information in the Data Bank for purposes of making its hiring decision or to investigate it. Second, a physician who is the subject of a report can add a statement to the report giving his side of the story. Guidebook, at F-1. Other than a restriction on including "names, addresses, or phone numbers," the contents of a physician's statement are left entirely up to the physician. Id. The statement is included with the report and is sent to every entity that gets the report. Id. Third, the Data Bank is not designed to provide protection to physicians at all costs, including the cost of not protecting future patients from problematic physicians.

### III.

Dr. Leal also challenges the Secretary's determination that the Hospital's 60-day suspension of his clinical privileges was a reportable event. Under the Act, a hospital that "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days" is required to report the action to the Data Bank. See 42 U.S.C. § 11133(a)(1)(A). A professional review action is defined as:

11

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (<u>which conduct affects or could affect adversely the health or welfare of a patient or patients</u>), and which affects (or may affect) adversely the clinical privileges . . . of the physician.

<u>Id.</u> § 11151(9) (emphasis added). Dr. Leal argues that he was not suspended for conduct "which . . . affects or could affect adversely the health or welfare of a patient or patients," <u>id.</u>, because no patients were involved in the incidents described in the adverse action report. Accordingly, he asserts that the Hospital did not take a "professional review action" against him that required reporting to the Data Bank.

In interpreting § 11151(9), "[o]ur starting point is the language of the statute itself." <u>Harrison v. Benchmark Elecs. Huntsville</u>, 593 F.3d 1206, 1212 (11th Cir. 2010) (quotation marks omitted). If the statutory text is unambiguous, we will enforce the statute as written and no further inquiry is necessary. <u>See</u> <u>United States v. Dodge</u>, 597 F.3d 1347, 1352 (11th Cir. 2010) (en banc); <u>see also</u> <u>Warshauer</u>, 577 F.3d at 1335 ("If the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case, and the statutory scheme is coherent and consistent, the inquiry is over." (quotation marks omitted)).

Under § 11151(9), a disciplinary action taken against a physician qualifies as a professional review action if the physician is disciplined for conduct that either

adversely affects patient health or welfare, or could do so.  See 42 U.S.C. §

11151(9).  The plain language of § 11151(9) makes it clear that actual harm to a

patient is not a prerequisite for a disciplinary action to qualify as a professional

review action.  It is enough that a physician is disciplined for conduct that could

result in harm to a patient.  See Moore v. Williamsburg Reg'l Hosp., 560 F.3d 166,

172 (4th Cir. 2009) ("Th[e] parenthetical clearly implies that the term 'professional

conduct' is not limited to past medical conduct that has already affected patient

welfare. . . .  [N]othing in the statute requires peer review committees to wait until

medical disaster strikes."); Gordon v. Lewistown Hosp., 423 F.3d 184, 203 (3d Cir.

2005) ("The plain language of the statute indicates the breadth of 'conduct'

encompassed within the definition of 'professional review action' by the inclusion

of conduct that 'could affect adversely the health or welfare of a patient.'" (quoting

42 U.S.C. § 11151(9))).  The fact that no patients were hit by pieces of the broken

telephone, or by the shattered copy machine glass, or by the careening metal cart,

or by the flying jelly beans, or by the airborne medical chart, is not dispositive.

The Hospital was required to report its disciplinary action to the Data Bank even

though its halls were not littered with injured patients as a result of Dr. Leal's very

bad day.

　　　Disruptive and abusive behavior by a physician, even if not resulting in

13

actual or immediate harm to a patient, poses a serious threat to patient health or welfare. A physician must work collaboratively with other members of a medical staff in order to provide quality care to patients. A hospital is one place where no one can do his job alone, where better teamwork means better care, and where disruptive behavior threatens lives. When a physician becomes enraged and lashes out at other members of the medical staff, patient welfare is endangered. That kind of behavior intimidates other health care workers, discouraging the kind of open communication and close cooperation that is essential to providing the best care to patients. The Hospital reported that as a result of Dr. Leal's violent outburst some of the nurses and technical staff were afraid to work with him in the future. That entirely predictable response is a serious problem. See Laurie Tarkan, Arrogant, Abusive, and Disruptive—and a Doctor, N.Y. Times, Dec. 2, 2008, at D1 (reporting about a survey of health care workers at 102 nonprofit hospitals revealing that 18 percent of the workers said that "they knew of a mistake that occurred because of an obnoxious doctor"); David O. Weber, For Safety's Sake Disruptive Behavior Must be Tamed, The Physician Executive, Sept.-Oct. 2004, at 17, http://net.acpe.org/MembersOnly/pejournal/2004/SeptemberOctober/ Articles/WeberDavid2.pdf (noting that in a survey of nurses, pharmacists, and other hospital workers, 7 percent of those surveyed had been involved in a

14

medication error during the past year because of their failure to speak up to a known intimidator about dispensing or giving a drug); Greta Porto & Richard Lauve, Disruptive Clinician Behavior: A Persistent Threat to Patient Safety, Patient Safety & Quality Healthcare, July-Aug. 2006, http://www.psqh.com/julaug06/disruptive.html (noting that "studies have shown that recipients of abusive behavior learn to cope by avoiding the abuser, even if this means failing to call when warranted and avoiding making suggestions that might improve care").[2] The Secretary reasonably determined that Dr. Leal's reported "violent and unprofessional actions," although not resulting in any known harm to a patient, is conduct that "could affect adversely" patient health or welfare. See 42 U.S.C. § 11151(9).

Dr. Leal contends that his suspension was not a reportable event for another reason. The Hospital summarily suspended his clinical privileges the day after the incident, and he argues that under the Act summary suspensions are to be treated differently from other professional review actions. In order for a summary suspension to be reportable, he asserts, it must have been imposed by the hospital "to protect patients from imminent danger." See Guidebook, at E-20 (noting that

---

[2] In keeping with Eleventh Circuit Internal Operating Procedure 10, "Citation to Internet Materials in an Opinion," under Federal Rule of Appellate Procedure 36, copies of all of the internet materials cited in this opinion are available at this Court's Clerk's Office.

15

the Department of Health & Human Services "assumes that hospitals use summary suspensions . . . to protect patients from imminent danger, rather than for reasons that warrant routine professional review actions"). His suspension was not imposed because of imminent danger to patients.

"Imminent danger" is not required before a summary suspension is reportable. The term "imminent danger" only appears in § 11112 of the Act, which sets out standards that professional review actions must comply with in order for those who participate in them to be immune from liability for money damages in suits brought by disciplined physicians. See 42 U.S.C. §11112; Bryan v. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1321–22 (11th Cir. 1994) (explaining that if a professional review action meets certain due process and fairness requirements the action's participants are immune from liability for money damages in suits brought by the disciplined physician). Section 11112 does not govern when a summary suspension, which is a type of professional review action, is reportable.

The plain language of the Act requires a hospital to report to the Data Bank "a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days." 42 U.S.C. § 11133(a)(1)(A). A summary suspension is "a professional review action." See also Guidebook, E-19 ("A summary suspension is reportable if it is: "(1) In effect or imposed for more

16

than 30 days; (2) Based on the professional competence or professional conduct of the physician . . . that adversely affects, or could adversely affect, the health or welfare of a patient; [and] (3) The result of a professional review action taken by a hospital . . . ." (numbering added)).  Because Dr. Leal's suspension plainly fits within § 11133(a)(1)(A), the Secretary's determination that it was  reportable was not arbitrary and capricious.

**AFFIRMED.**

Edmondson, Circuit Judge, concurs in the result.