[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13588
_____

B.K. Docket No. 2:09-bk-00634-TOM11


In re: BFW LIQUIDATION, LLC,

Debtor.

_____


WILLIAM S. KAYE,
Trustee of the BFW Liquidating Trust,

Plaintiff-Appellee,

versus

BLUE BELL CREAMERIES, INC.,

Defendant-Appellant.

_____

Appeal from the United States Bankruptcy Court
for the Northern District of Alabama
_____

(August 14, 2018)

Before MARTIN, JULIE CARNES, and GILMAN,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

Bruno's Supermarkets, LLC ("the Debtor") filed for bankruptcy under Chapter 11. In administering and ultimately liquidating the bankruptcy estate, the Trustee filed an adversary proceeding against Blue Bell Creameries, Inc. ("Blue Bell") to recover monies the Trustee contended were owed by Blue Bell to the estate. Specifically, the Trustee sought to recover from Blue Bell more than $500,000 in a series of payments that Blue Bell had received from the Debtor during the 90-day period preceding the Debtor's bankruptcy filing. Each payment by the Debtor was made for recent shipments of ice cream and other merchandise that Blue Bell had delivered to the Debtor for the latter to sell to the public.

Blue Bell acknowledged that the payments it received from the Debtor constituted preferences under 11 U.S.C. § 547(b),[1] which meant that absent a valid defense by Blue Bell, the Trustee would be empowered to "avoid" those payments: that is, require Blue Bell to repay the money it had earlier been paid by the Debtor for goods it had actually delivered. Blue Bell argued below that it had just such a defense. Specifically, 11 U.S.C. § 547(c)(4) prohibits "avoidance" by the trustee to

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] In pertinent part, as defined by § 547(b), a preference occurs when an insolvent debtor transfers money to pay a creditor for a prior debt within 90 days before filing a bankruptcy petition.

2

the extent the recipient of payments during the preference period provided "new value" to the debtor during that same period.

Despite Blue Bell having provided new value to the Debtor here—lots of ice cream products that the latter was able to sell to its customers in its efforts to remain financially afloat—the bankruptcy court concluded that it was bound by our precedent to reject, in large part, Blue Bell's new-value defense. Specifically, relying on *Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*, 841 F.2d 1082 (11th Cir. 1988), the bankruptcy court held that Blue Bell was entitled to an offset against its preference liability only to the extent that any new value it extended to the Debtor "remained unpaid" as of the date the bankruptcy petition was filed. Because Blue Bell was paid for many of the products that it had delivered, the bankruptcy court concluded that *Jet Florida System* prevented Blue Bell from using the new-value defense to defeat the Trustee's efforts to "avoid" such payments. As a result, the court ruled that Blue Bell had to return much of the money it had been paid for the goods it provided the Debtor.

Blue Bell appeals the bankruptcy court's decision. After careful review, and with the benefit of oral argument, we conclude that the language in *Jet Florida System* relied on by the bankruptcy court was dictum and, as such, it does not bind us. Construing § 547(c)(4) anew, we conclude that it does not require new value to

3

remain unpaid.  We therefore vacate the bankruptcy court's judgment and remand for a new calculation of Blue Bell's preference liability.

## BACKGROUND

### I.    Factual Background

The Debtor, Bruno's Supermarkets, LLC,[2] was a grocery-store chain with more than 60 stores in Alabama and Florida.  Blue Bell sold ice cream and related products to the Debtor on credit.  The Debtor traditionally paid Blue Bell twice weekly, meaning that, under that payment scheme, the Debtor remained current as to the money it owed Blue Bell.

The Debtor began suffering from liquidity problems, however, and in August 2008, it hired an advisory firm to provide guidance on cash-flow management.  Absent immediate action, the Debtor expected to run out of cash.  On the advisory firm's recommendation, the Debtor began writing checks to its vendors, including Blue Bell, only once a week, not twice.  It also began "stretching," or delaying, payments, which occasionally included cutting checks and then holding those checks for a period of time.  Under this new "slow-pay" protocol, the Debtor would ultimately pay Blue Bell for the products it had delivered, but it would take longer to do so.  This practice also resulted in Blue Bell receiving payments at

---

[2]  During the underlying bankruptcy proceedings, the Debtor sold all of its intellectual property—including its name—and changed its name to BFW Liquidation, LLC.

irregular intervals, particularly during the 90 days immediately preceding the bankruptcy filing.

Between November 7, 2008, and February 5, 2009,[3] the Debtor paid Blue Bell a total of $563,869.37 in 13 separate payments.  At least $250,000 of that total was for products that Blue Bell had delivered to the Debtor before November 7, 2008.  During the same time period—between November 7, 2008, and February 5, 2009—Blue Bell delivered $435,705.65 worth of ice cream and other merchandise to the Debtor's grocery stores.  Blue Bell delivered these products in relatively small batches on an almost daily basis, making about 1,700 separate deliveries.  These transactions are summarized in the following chart[4]:

| Date / Time Period | Invoices / Deliveries from Blue Bell to the Debtor | Payments the Debtor Made to Blue Bell |
|---|---|---|
| Nov. 7, 2008 – Nov. 11, 2008 | $24,271.70 | |
| Nov. 12, 2008 | | $43,924.47 |
| Nov. 12, 2008 – Nov. 24, 2008 | $108,872.64 | |
| Nov. 25, 2008 | | $67,821.23 |
| Nov. 25, 2008 – Dec. 1, 2008 | $42,858.51 | |
| Dec. 2, 2008 | | $55,149.91 |
| Dec. 2, 2008 – Dec. 4, 2008 | $11,523.17 | |
| Dec. 5, 2008 | | $27,485.38 |
| Dec. 5, 2008 – Dec. 8, 2008 | $13,783.29 | |
| Dec. 9, 2008 | | $33,320.61 |

---

[3]  February 5, 2009, is the date on which the debtor filed its bankruptcy petition.  November 7, 2008, began the 90-day period prior to the filing.

[4]  The information in this chart is derived from an exhibit that the Trustee introduced at trial.  In its initial brief on appeal, Blue Bell concedes that the Trustee's exhibit is accurate.

| | | |
|---|---|---|
| Dec. 9, 2008 – Dec. 14, 2008 | $41,029.32 | |
| Dec. 15, 2008 | | $26,327.00 |
| Dec. 15, 2008 – Jan. 4, 2009 | $101,670.75 | |
| Jan. 5, 2009 | | $59,980.15 |
| Jan. 5, 2009 | $10,337.94 | |
| Jan. 6, 2009 | | $55,508.85 |
| Jan. 6, 2009 – Jan. 12, 2009 | $39,041.37 | |
| Jan. 13, 2009 | | $47,162.09 |
| Jan. 13, 2009 – Jan. 19, 2009 | $23,737.88 | |
| Jan. 20, 2009 | | $28,483.07 |
| Jan. 20, 2009 – Jan. 29, 2009 | $10,297.79 | |
| Jan. 30, 2009 | | $33,186.46 |
| Jan. 30, 2009 | | $48,213.42 |
| Jan. 30, 2009 – Feb. 2, 2009 | $7,246.81 | |
| Feb. 3, 2009 | | $37,306.73 |
| Feb. 3, 2009 | $1,034.48 | |

## II.    Procedural History

The Debtor filed a voluntary Chapter 11 bankruptcy petition on February 5, 2009.  On September 25, 2009, the bankruptcy court confirmed the Debtor's Fourth Amended Plan of Liquidation.  Pursuant to the plan and confirmation order, William Kaye ("the Trustee") was appointed the liquidating trustee for the Debtor's bankruptcy estate.  Acting for the benefit of the bankruptcy estate, the Trustee was responsible for enforcing any avoidance actions that might lie against creditors of the Debtor.

In January 2011, the Trustee brought this adversary proceeding against Blue Bell seeking to avoid, as a preference, the $563,869.37 that the Debtor had paid to Blue Bell during the 90-day period prior to the filing of the bankruptcy petition:

6

that is, any payments made between November 7, 2008, and February 5, 2009. Blue Bell and the Trustee eventually stipulated that all of the elements of a preference claim under 11 U.S.C. § 547(b) had been satisfied with respect to each of the transfers making up the $563,869.37. That is, Blue Bell had received these monies during the preference period and they were in payment of a prior debt.

Blue Bell asserted two defenses to the Trustee's preference claims: § 547(c)(2)'s ordinary-course-of-business defense and § 547(c)(4)'s subsequent-new-value defense. The bankruptcy court rejected Blue Bell's invocation of the ordinary-course-of-business defense. Blue Bell does not challenge that ruling on appeal.

With respect to the subsequent-new-value defense, the bankruptcy court concluded that Blue Bell was entitled to an offset against its preference liability only to the extent that any new value it extended to the Debtor during the preference period "remained unpaid" as of the petition date. The court relied on *Jet Florida System*, in which our Court stated that § 547(c)(4) had "generally been read to require . . . that the new value must remain unpaid." *See In re Jet Fla. Sys., Inc.*, 841 F.2d at 1083.

Excluding all new value for which the Debtor had paid, the bankruptcy court concluded that the Trustee could avoid—that is, claw back—$438,496.47 of the $563,869.37 transferred to Blue Bell during the preference period. It reached this

7

figure by relying on the calculations of the Trustee's expert witness, who had analyzed the Debtor's books and records and traced each of the 13 payments made during the preference period to the particular invoices those payments were designated to cover. Any invoice the Debtor had paid was excluded from the amount of new value that Blue Bell could use to offset its preference liability. The bankruptcy court entered judgment in favor of the Trustee and against Blue Bell on December 20, 2016.

Blue Bell filed a notice of appeal to the district court. Shortly thereafter, Blue Bell and the Trustee jointly certified that an immediate appeal of the bankruptcy court's order directly to this Court would materially advance the progress of the case.[5] Blue Bell then filed a petition for permission to appeal the bankruptcy court's order directly to this Court. A panel of this Court granted the petition, and we now turn to the merits of Blue Bell's appeal.

---

[5] Under 28 U.S.C. § 158(d)(2), the district court, the bankruptcy court, or the parties acting jointly, may certify an order of the bankruptcy court for direct appeal to this Court if (1) the order involves a question of law as to which there is no controlling decision of this Court or of the Supreme Court; (2) the order involves a matter of public importance; (3) the order involves a question of law requiring resolution of conflicting decisions; or (4) an immediate appeal may materially advance the progress of the case or proceeding in which the appeal is taken. 28 U.S.C. § 158(d)(2)(A). Here, the parties jointly certified that an immediate appeal of the bankruptcy court's order directly to this Court would materially advance the progress of the adversary proceeding.

## DISCUSSION

Blue Bell argues that the statement in *Jet Florida System* indicating that new value must remain unpaid is dictum, and that the statute does not set out any such requirement. The Trustee argues that the statement at issue in *Jet Florida System* constitutes precedent that we are bound to follow. Even if that statement is dictum, however, the Trustee contends that policy considerations nonetheless weigh in favor of requiring new value to remain unpaid in order for that new value to offset a defendant's preference liability. The Trustee further argues, in the alternative, that transfers avoidable as a preference under § 547(b), and on no other ground, are "otherwise unavoidable" under § 547(c)(4)(B) and, therefore, any new value paid for with such transfers cannot offset a creditor's preference liability.

### I.    Whether the Statement in *Jet Florida System* Indicating that § 547(c)(4) Requires New Value to "Remain Unpaid" Is Dictum

#### A.    Definition of "Dictum"

"*Dictum* is a term that has been variously defined as a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case." *Black v. United States*, 373 F.3d 1140, 1144 (11th Cir. 2004) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996), and *United States v. Hunter*, 172 F.3d 1307, 1310 (11th Cir. 1999) (Ed Carnes, J., concurring)). Whether a particular statement constitutes a holding or dictum depends on the facts of the case. *See Edwards v. Prime, Inc.*, 602 F.3d

9

1276, 1298 (11th Cir. 2010) ("[R]egardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case."). If a statement is "not necessary to the result the Court reached in the case," then that statement is dictum. *See Hunter*, 172 F.3d at 1310 (Ed Carnes, J., concurring); *see also United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us." (quoting *United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009))), *cert. denied*, 138 S. Ct. 566 (2017).

"[D]icta is not binding on anyone for any purpose." *Edwards*, 602 F.3d at 1298. Accordingly, if the statement in *Jet Florida System* indicating that new value must remain unpaid is dictum, then we are "free to give . . . fresh consideration" to this question. *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*, 957 F.2d 1575, 1578 (11th Cir. 1992).

## B.      The Statement at Issue in *Jet Florida System* Is Dictum

Section 547(c)(4), in pertinent part, prohibits the Trustee from avoiding a transfer to a creditor (that is, requiring reimbursement from the creditor) if, after the transfer, the creditor gave new value to the debtor that was "not secured by an otherwise unavoidable security interest" and "on account of which new value the debtor did not make an otherwise unavoidable transfer" to the creditor. The statute makes no mention of any requirement that any new value provided by a creditor

10

remain unpaid.  Nevertheless, in *Jet Florida System*, we opined that § 547(c)(4) "ha[d] generally been read to require:  (1) that the creditor must have extended the new value after receiving the challenged payments, (2) that the new value must have been unsecured, and (3) that the new value must remain unpaid."  *In re Jet Fla. Sys., Inc.*, 841 F.2d at 1083.  We relied on three bankruptcy court opinions as the basis for this observation.  *Id.* (citing *Waldschmidt v. Ranier (In re Fulghum Const. Corp.)*, 45 B.R. 112, 119 (Bankr. M.D. Tenn. 1984), *aff'd*, 78 B.R. 146 (M.D. Tenn. 1987), *rev'd*, 872 F.2d 739 (6th Cir. 1989); *Keydata Corp. v. Bos. Edison Co. (In re Keydata Corp.)*, 37 B.R. 324, 328 (Bankr. D. Mass. 1983); *Pettigrew v. Tr. Co. Bank (In re Bishop)*, 17 B.R. 180, 183 (Bankr. N.D. Ga. 1982)).

The trustee[6] in *Jet Florida System* had sought to avoid, as a preference, almost $12,000 in rent for a warehouse that the debtor had paid to the appellant during the preference period, arguing that because the debtor had vacated the premises before the beginning of the preference period, the latter received no value from the rental premises.  *See id.* at 1082–83.  The appellant argued that it was

---

[6] The district court's opinion in *Jet Florida System* indicates that the adversary proceeding in that case was brought by Air Florida, Inc. (the debtor) and Air Florida System, Inc.  *See Charisma Inv. Co., N.V. v. Air Fla. Sys., Inc.*, 68 B.R. 596, 598 (S.D. Fla. 1986).  Therefore, it appears that Air Florida, Inc. was acting as a debtor in possession with all the rights of a trustee.  *See* 11 U.S.C. § 1107(a).  For ease of discussion, and because Air Florida, Inc. was standing "in the shoes of a trustee," *Fanelli v. Hensley (In re Triangle Chemicals, Inc.)*, 697 F.2d 1280, 1284 (5th Cir. 1983), we refer to the plaintiff in *Jet Florida System* as "the trustee," which is consistent with West's synopsis at the beginning of this Court's opinion in *Jet Florida System*.  *See In re Jet Fla. Sys., Inc.*, 841 F.2d at 1082.

11

nonetheless entitled to an offset against its preference liability under § 547(c)(4) because, notwithstanding the debtor's choice not to make use of the offer, the appellant had continued to make the leased premises available to the debtor, which in itself constituted the providing of new value. The bankruptcy court found that the debtor had indeed vacated the premises before the beginning of the preference period. *Id.* at 1082, 1084. The district court found no error in that finding and, as a result, concluded that the appellant had not provided any new value to the debtor. That being so, the court held that the new-value defense was not applicable, and the appellant had to give the money back to the bankruptcy estate. *Id.* at 1083.

On appeal, we agreed with the district court and held that, absent any use of the leased premises by the debtor, simply making the premises available to the debtor did not confer a "material benefit" on the debtor sufficient to constitute "new value." *Id.* at 1084. In other words, the extent of our ruling was to hold that the appellant had not provided any new value to the debtor subsequent to his payment of almost $12,000.

In our earlier recitation of the elements of § 547(c)(4)'s new-value defense, however, we had noted that, in addition to requiring the providing of new value subsequent to a payment—the prong on which the appellant floundered—there were two other elements: "that the new value must have been unsecured" and "that the new value must remain unpaid." *Id.* at 1083. Although we cited those

12

additional two elements, neither played any role in our decision. Indeed, we noted that both elements had "concededly been satisfied." *Id.*

For this reason, our statement in *Jet Florida System* indicating that new value must remain unpaid was dictum. This purported requirement was never at issue in the case and it played no role in our decision or reasoning. *See Black*, 373 F.3d at 1144; *Hunter*, 172 F.3d at 1310 (Ed Carnes, J., concurring). Because our statement in *Jet Florida System* indicating that § 547(c)(4) requires new value to remain unpaid is dictum, we are "free to give . . . fresh consideration" to the question of whether § 547(c)(4) requires new value to remain unpaid. *See Great Lakes Dredge & Dock Co.*, 957 F.2d at 1578. We do so now.

## II.    Whether § 547(c)(4) Requires New Value to Remain Unpaid

Having analyzed the plain language of the statute, as well as the history of its development, we hold that § 547(c)(4) does not require new value to remain unpaid. As to the Trustee's argument that policy considerations support its interpretation, we disagree and conclude that policy considerations strongly disfavor the Trustee's position. We explain why.

### A.    Standard of Review and Analytical Framework

Questions of statutory interpretation are reviewed *de novo*. *Bankston v. Then*, 615 F.3d 1364, 1367 (11th Cir. 2010); *see also Pollitzer v. Gebhardt*, 860 F.3d 1334, 1338 (11th Cir. 2017) ("Interpretations of the [Bankruptcy] Code are

questions of law that we review *de novo*."). "The starting point in statutory interpretation is the language of the statute itself." *Bankston*, 615 F.3d at 1367 (quoting *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009)). "If the 'language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case,' and 'the statutory scheme is coherent and consistent,' the inquiry is over." *Id.* (quoting *Warshauer*, 577 F.3d at 1335). "In determining whether a statute is plain or ambiguous, we consider 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *Warshauer*, 577 F.3d at 1335); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997). Statutory language is ambiguous if it is susceptible to more than one reasonable interpretation. *Med. Transp. Mgmt. Corp. v. Comm'r of I.R.S.*, 506 F.3d 1364, 1368 (11th Cir. 2007).

B.      **The plain, unambiguous, language of § 547(c)(4) does not require new value to remain unpaid**

Under § 547(b) of the Bankruptcy Code, a bankruptcy trustee may avoid certain transfers that the debtor made to a creditor within 90 days of the petition date.[7]  A transfer that meets the requirements for avoidance under § 547(b) is

---

[7]  Specifically, § 547(b) provides:

> (b) Except as provided in subsections (c) and (i) of [§ 547], the trustee may avoid any transfer of an interest of the debtor in property—
>
>     (1) to or for the benefit of a creditor;

called a preference, and the trustee has the burden of proof on whether any particular transfer meets those requirements. *See* 11 U.S.C. § 547(g).

If a transfer is avoided under § 547(b), then the trustee may recover the amount of the transfer from the creditor to whom the transfer was made.[8] *See id.* § 547(b) (providing for avoidance of a preferential transfer); *id.* § 550(a) (providing for recovery of the amount of an avoided preferential transfer). The creditor will then have only an unsecured claim against the bankruptcy estate for the amount recovered by the trustee. *See id.* § 502(h).

---

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of [the Bankruptcy Code];

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of [the Bankruptcy Code].

[8] In addition, any claim that the creditor has against the estate will be disallowed until the creditor repays the amount of the avoided transfer. 11 U.S.C. § 502(d).

Section 547(c) excepts from avoidance certain transfers that would otherwise be avoidable under § 547(b).  One of those exceptions—the subsequent-new-value defense—is defined in § 547(c)(4), which states:

> (c) The trustee may not avoid under this section a transfer—
>
> . . . .
>
> > (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
> >
> > > (A) not secured by an otherwise unavoidable security interest; and
> > >
> > > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor . . . .

*Id.* § 547(c)(4).  The creditor against whom avoidance is sought under § 547(b) has the burden of proving nonavoidability under § 547(c).  *Id.* § 547(g).

Nothing in the language of § 547(c)(4) indicates that an offset to a creditor's § 547(b) preference liability is available only for new value that remains unpaid. Instead, the plain language of the statute requires only that (1) any new value given by the creditor must not be secured by an otherwise unavoidable security interest and (2) the debtor must not have made an otherwise unavoidable transfer to or for the benefit of the creditor on account of the new value given.  *See id.*

By its plain terms, then, the statute only excludes "paid" new value that is paid for with "an otherwise unavoidable transfer."  *See id.* § 547(c)(4)(B).

16

Therefore, so long as the transfer that pays for the new value is itself avoidable, that transfer is not a barrier to assertion of § 547(c)(4)'s subsequent-new-value defense.  *See id.*

In reaching this conclusion, we find common ground with the Fourth, Fifth, Eighth, and Ninth Circuits.  *See Hall v. Chrysler Credit Corp. (In re JKJ Chevrolet, Inc.)*, 412 F.3d 545, 551–52 (4th Cir. 2005) (rejecting the idea that § 547(c)(4) requires new value to remain unpaid and holding that, "under the plain terms of the statute," whether payments for new value deprive a creditor of the statute's new-value defense "depends on whether the payments were *otherwise unavoidable*" (emphasis in original)); *Jones Truck Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 329 (8th Cir. 1997) (concluding that, "under the plain language of § 547(c)(4)(B)," payments that the creditor received from the debtor after providing new value did not prevent the creditor from using that new value as a defense to avoidance because the payments at issue were themselves "otherwise avoidable"); *Mosier v. Ever–Fresh Food Co. (In re IRFM, Inc.)*, 52 F.3d 228, 231–33 (9th Cir. 1995) (holding that "a new value defense is permitted unless the debtor repays the new value by a transfer which is otherwise unavoidable"); *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1090–93, 1093 n.2 (5th Cir. 1994) (holding that a creditor was entitled to § 547(c)(4)'s subsequent-new-value defense because, although the

17

debtor had paid for the new value provided, it did so "with preferences that were not 'otherwise unavoidable'").[9]

### C.   The statutory history of § 547(c)(4) supports our conclusion that new value need not remain unpaid

When the plain language of a statute is unambiguous, we need not—indeed, should not—look beyond that plain language to determine its meaning.  *Iberiabank v. Beneva 41-I, LLC*, 701 F.3d 916, 924 (11th Cir. 2012) ("We look first to the text of the statute.  If the text of the statute is unambiguous, we need look no further." (citation omitted)); *see also Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 969–70 (11th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 2292 (2017).  Here, the plain language of § 547(c)(4) unambiguously excludes paid new value as a defense to a creditor's preference liability only when that new value is paid for with an "otherwise unavoidable transfer."  11 U.S.C. § 547(c)(4)(B).  We therefore have no need to examine other interpretive resources, such as predecessor statutes, to determine whether we should divine a broader preclusion of paid new value under

---

[9]  By contrast, in 1986, the Seventh Circuit held, without much discussion, that § 547(c)(4) does require new value to remain unpaid.  *In re Prescott*, 805 F.2d 719, 727–28 (7th Cir. 1986).  Since then, the Seventh Circuit has continued to follow that approach.  *See, e.g.*, *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1121 (7th Cir. 1998).  A few years later, the Third Circuit also stated in a conclusory fashion that § 547(c)(4) requires new value to remain unpaid.  *N.Y.C. Shoes, Inc. v. Bentley Int'l, Inc. (In re N.Y.C. Shoes, Inc.)*, 880 F.2d 679, 680 (3d Cir. 1989).  However, whether § 547(c)(4) requires new value to remain unpaid was not at issue in that case.  *See id.* at 681–82; *cf. Friedman's Liquidating Tr. v. Roth Staffing Cos. (In re Friedman's Inc.)*, 738 F.3d 547, 551–52 (3d Cir. 2013) (concluding that the statement in *New York City Shoes* indicating that new value must remain unpaid as of the petition date was not a holding with respect to whether post-petition petition payments could affect a creditor's subsequent-new-value defense).

§ 547(c)(4).  *See, e.g.*, *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes." (citation omitted)); *see also Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 62–63 (2004) (utilizing statutory history to resolve ambiguity in the plain language of a statute); *id.* at 66–67 (Kennedy, J., concurring) (endorsing the use of statutory history to resolve ambiguity in the text of a statute); *id.* at 67–68 (Thomas, J., concurring in judgment) (same).

Nevertheless, we are cognizant of the statutory history of § 547(c)(4), and our review of § 547(c)(4)'s predecessor statute bolsters our conclusion that new value need not remain unpaid.  *Cf. Koch Foods, Inc. v. Sec'y, U.S. Dep't of Labor*, 712 F.3d 476, 480–86 (11th Cir. 2013) (reasoning that statutory history bolstered an interpretation of unambiguous statutory text).  Section 547(c)(4) was enacted as part of the Bankruptcy Reform Act of 1978.  *See* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 101, 92 Stat. 2549, 2598–99.[10]  The predecessor to § 547(c)(4) was § 60(c) of the Bankruptcy Act of 1898.  *See, e.g.*, S. Rep. No. 95-989, at 88 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5874; H.R. Rep. No. 95-595, at 374 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6330;

---

[10]  Section 547(c)(4) has not been amended since it was enacted in 1978.  *See* 11 U.S.C. § 547 note (2012) (Amendments).  *Compare* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 101, 92 Stat. 2549, 2598–99, *with* 11 U.S.C. § 547(c)(4) (2012).

19

*see also* 11 U.S.C. tbl.II (Supp. III 1979) (identifying 11 U.S.C. § 96(c) (1976) as the predecessor to § 547(c)).[11]

> Prior to the enactment of § 547(c)(4), § 60(c) provided as follows:
>
> If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit *remaining unpaid* at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him.

11 U.S.C. § 96(c) (1976) (emphasis added).[12]

When Congress repealed this provision in 1978 and replaced it with § 547(c)(4), the "remaining unpaid" language was replaced with § 547(c)(4)(B)'s requirement that the debtor "not make an otherwise unavoidable transfer to or for the benefit of" the creditor who gave new value. *See* Bankruptcy Reform Act of 1978 §§ 101, 401, 92 Stat. at 2598–99, 2682. *Compare* 11 U.S.C. § 96(c) (1976), *with* 11 U.S.C. § 547(c)(4)(B) (Supp. III 1979). "As we have explained, 'changes in statutory language generally indicate an intent to change the meaning of the

---

[11]  Section 60(c) of the Bankruptcy Act of 1898 was codified at 11 U.S.C. § 96(c) in the pre-1978 version of title 11. *See* 11 U.S.C. § 547 note (2012) (Senate Report No. 95-989) ("The fourth exception codifies the net result rule in section 60c of current law [section 96(c) of former title 11]." (brackets in original)). *Compare* Bankruptcy Act of 1898, ch. 541, § 60(c), 30 Stat. 544, 562, *with* 11 U.S.C. § 96(c) (1976).

[12]  With the exception of two spelling changes in 1938, § 60(c) remained unchanged from its enactment in 1898 until its repeal in 1978. *See* 11 U.S.C. § 96 note (1976) (Amendments) (declaring that, in 1938, § 96(c) was "reenacted without change"); Chandler Act, ch. 575, sec. 1, § 60(c), 52 Stat. 840, 870 (1938) (changing "afterwards" to "afterward" and "estates" to "estate" in the statutory text). *Compare* 11 U.S.C. § 96(c) (1934), *and* Bankruptcy Act of 1898 § 60(c), 30 Stat. at 562, *with* 11 U.S.C. § 96(c) (Supp. IV 1938), *and* 11 U.S.C. § 96(c) (1976).

statute.'"  *Edwards*, 602 F.3d at 1299 (quoting *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 817 (11th Cir. 2004)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 256 (2012) ("[A] change in the language of a prior statute presumably connotes a change in meaning.").  Accordingly, in the absence of any evidence to the contrary, one can plausibly infer that, by replacing § 60(c)'s "remaining unpaid" language with new language that omits any such requirement, Congress intended to eliminate § 60(c)'s requirement that new value remain unpaid, and to replace that requirement with something substantively different.

Of course, when a change in statutory language results from a mere recodification of the statute, making an assumption about the absence of earlier language becomes a trickier proposition.  *See, e.g.*, *Fla. Agency for Health Care Admin. v. Bayou Shores SNF, LLC (In re Bayou Shores SNF, LLC)*, 828 F.3d 1297, 1300 (11th Cir. 2016); *Koch Foods, Inc.*, 712 F.3d at 486.  When statutory language is changed in a recodification, it is ordinarily presumed that the change in language does not connote a change in meaning "unless Congress's intention to make a substantive change is 'clearly expressed.'"  *In re Bayou Shores SNF, LLC*, 828 F.3d at 1300 (quoting *United States v. Ryder*, 110 U.S. 729, 740 (1884)).

Section 547(c)(4), however, is not a mere recodification of § 60(c).  Rather, § 547(c)(4) constitutes a substantive departure from the way exchanges of value

21

between creditors and debtors during the preference period were handled under the Bankruptcy Act of 1898.  That § 547(c)(4) worked a substantive change in the way new value may be used to offset preference liability is not only evidenced by the clear change in statutory language, but also suggested by the history leading to its enactment.

In 1970, Congress established the Commission on the Bankruptcy Laws of the United States ("the Commission") to "study, analyze, evaluate, and recommend changes to the [Bankruptcy Act of 1898]."  Act of July 24, 1970, Pub. L. No. 91-354, § 1, 84 Stat. 468, 468.  The Commission ultimately recommended "a substantial revision of the preference section."  Comm'n on the Bankr. Laws of the U.S., Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pt.I, at 201 (1973).  With respect to § 60(c), the Commission specifically recommended eliminating the requirement that new value remain unpaid on the petition date, stating:

> The provision in the present Act (section 60c) provides that if a creditor has been preferred and afterwards in good faith gives further credit to the debtor without security, the amount of the new credit unpaid at the date of bankruptcy may be set off against the amount recoverable from him on account of the preference.
>
> The Commission recommends changes eliminating (a) the "remaining unpaid" provision; (b) the good faith requirement of any new credit extension; and (c) the requirement that no security be taken for the new credit.

*Id.* at 210.[13] That the Commission specifically recommended eliminating § 60(c)'s "remaining unpaid" requirement cuts against an inference that Congress might have intended to preserve that requirement when it replaced the "remaining unpaid" language in § 60(c) with § 547(c)(4)(B)'s requirement that the debtor "not make an otherwise unavoidable transfer" to the creditor who received the preference.

Given that all other signs point toward a conclusion that § 547(c)(4) represents a departure from, rather than a recodification of, the "remaining unpaid" requirement in § 60(c), we conclude that removal of the "remaining unpaid" language effected a substantive change in the meaning of the statute. Thus, a

---

[13] The Commission produced a proposed bankruptcy act that was introduced in both houses of Congress. *See* S. 236, 94th Cong. (1975); H.R. 31, 94th Cong. (1975); H.R. 10792, 93d Cong. (1973); S. Rep. No. 95-989, at 2 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5788; H.R. Rep. No. 95-595, at 2 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 5964; Comm'n on the Bankr. Laws of the U.S., Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pt.II (1973). With respect to the subsequent-new-value defense, the Commission's proposed legislation stated:

> A transfer is not voidable to the extent of new value given at the time of the transfer or at any time thereafter. In determining the amount of new value given, the value of any security taken for it shall be deducted.

Comm'n on the Bankr. Laws of the U.S., Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pt.II, at 167 (1973). Although a competing bill drafted by the National Conference of Bankruptcy Judges ("NCBJ") was also introduced in both houses of Congress, that bill's subsequent-new-value provision was identical to the Commission's proposal. *Compare* S. 236, 94th Cong. § 4-607(c)(2) (1975) (the Commission's proposal as introduced in the Senate), *and* H.R. 31, 94th Cong. § 4-607(c)(2) (1975) (the Commission's proposal as introduced in the House), *with* S. 235, 94th Cong. § 4-607(c)(2) (1975) (the NCBJ's proposal as introduced in the Senate), *and* H.R. 32, 94th Cong. § 4-607(c)(2) (1975) (the NCBJ's proposal as introduced in the House).

review of the statutory development of § 547(c)(4) bolsters our conclusion that § 547(c)(4) does not require new value to remain unpaid.

Nonetheless, in light of the unambiguous statutory language, we would reach the same conclusion even if it could be shown that Congress did not intend a substantive change in the meaning of the statute when it replaced § 60(c)'s "remaining unpaid" language with § 547(c)(4)(B)'s requirement that the debtor "not make an otherwise unavoidable transfer to or for the benefit of" the creditor who gave new value. *Cf. United States v. Wells*, 519 U.S. 482, 496–97 (1997) (concluding that a change in statutory language effected a substantive change in meaning even though the Reviser's Note to the amended statute explained that the amendment "was without change of substance"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 257 (2012) ("The new text is the law, and where it clearly makes a change, that governs.  This is so even when the legislative history consisting of the codifiers' report expresses the intent to make no change.").

### D.    Policy considerations also weigh in favor of a conclusion that new value need not remain unpaid

The Trustee argues that, notwithstanding the statutory language, we should nonetheless rule for him because policy considerations favor his argument that new value must remain unpaid in order for a creditor to rely on the new-value defense. Our interpretation of the language of the statute obviously trumps any opposing

24

policy argument.  But even if it didn't, we would disagree with the Trustee that policy considerations support his interpretation.  To the contrary, we think that policy considerations strongly disfavor his position.

As we noted in *Jet Florida System*, one of the "principal policy objectives underlying the preference provisions of the Bankruptcy Code" is "to encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse."  841 F.2d at 1083; *accord Union Bank v. Wolas*, 502 U.S. 151, 161 (1991).  "Another related objective of this section is to promote equality of treatment among creditors."  *In re Jet Fla. Sys., Inc.*, 841 F.2d at 1083; *see also Wolas*, 502 U.S. at 161 ("Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.").

1.    Encouraging creditors to continue extending credit to
        financially troubled entities

Requiring new value to "remain unpaid" would hinder the policy objective of encouraging vendors to continue extending credit to financially troubled debtors, especially in situations like this one in which the vendor and the debtor regularly engaged in relatively short-term credit transactions.  If new value must remain unpaid, then vendors who sense that a debtor is in financial difficulty will have an incentive to stop delivering any goods because any payments they receive,

after extension of a short-term period of credit on these deliveries, might be avoided, and thereby clawed back by the trustee in bankruptcy.

By contrast, if new value need not remain unpaid, then a vendor can continue extending short-term credit to the debtor without fear of having all of the payments it receives for its newly delivered goods clawed back by the trustee in bankruptcy. So long as the vendor continues to extend additional credit to the debtor, it is at risk of losing only a portion of the payments it receives from the debtor, as explained below. Thus, a conclusion that new value need not remain unpaid promotes one of the "principal policy objectives underlying the preference provisions of the Bankruptcy Code"—encouraging creditors to continue extending credit to financially troubled debtors. *See In re Jet Fla. Sys., Inc.*, 841 F.2d at 1083.

A chart can perhaps best illustrate the above concepts. The following chart illustrates a scenario where the vendor-creditor ships $1,000 worth of goods to the debtor every other week, and the debtor pays for those goods one week after delivery.

|  | Transfer from creditor to debtor | Transfer from debtor to creditor |
|---|---|---|
| Transfer 1 | $1,000 in goods |  |
| Transfer 2 |  | $1,000 in cash |
| Transfer 3 | $1,000 in goods |  |
| Transfer 4 |  | $1,000 in cash |
| Transfer 5 | $1,000 in goods |  |

26

| Transfer 6 | | $1,000 in cash |
|---|---|---|
| Transfer 7 | $1,000 in goods | |
| Transfer 8 | | $1,000 in cash |
| Transfer 9 | $1,000 in goods | |
| Transfer 10 | | $1,000 in cash |
| **DEBTOR'S BANKRUPTCY FILING** | | |

Even-numbered transfers—Numbers 2, 4, 6, 8, and 10—show five

payments, in the amount of $1,000 each, by the debtor to the vendor-creditor

within the 90-day preference period, meaning that each such payment is potentially

avoidable by a trustee. Transfers 3, 5, 7, and 9, which show the shipment of goods

by the vendor, constitute equivalent new value in the total amount of $4,000

provided by the vendor subsequent to payments 2, 4, 6, and 8, respectively.[14] That

being so, and under Blue Bell's position, this $4,000 in new goods shipped would

wash $4,000 of the previous payments made by the debtor, for purposes of

avoidability. Yet, under the Trustee's position, the vendor loses this new-value

defense because, after conferring new value via the shipment of goods equivalent

to the previous payment made by the debtor, the debtor later paid off the value of

the shipped goods that constituted the new value. Specifically, Transfer 4 paid off

Transfer 3; Transfer 6 paid off Transfer 5; Transfer 8 paid off Transfer 7; and

Transfer 10 paid off Transfer 9. According to the position of the Trustee in this

_____

[14] Transfer 1 is not a candidate for a "new-value" set-off because there is no prior cash payment from the debtor for it to set off.

27

case, the vendor in the above scenario would be required to repay the entirety of the $5,000 paid to him by the debtor, even though new value was conferred on the debtor as to $4,000 of these payments.

Blue Bell argues that a subsequent payment by the debtor to the vendor-creditor for new value that was previously provided to the former does not negate the defense as to the particular new value in question. Adopting that position, the vendor in this scenario would be protected by the new-value defense as to debtor payments 2, 4, 6, and 8 because, subsequent to each of these payments by the debtor, the vendor provided new value to the debtor in the form of new goods shipped. It is only the last $1,000 payment by the debtor—Transfer 10—that Blue Bell concedes would be avoidable by the trustee because the vendor delivered no goods after this last payment by the debtor, meaning the vendor provided no subsequent new value. Because it would lack a new-value defense to the preference represented by this last payment, the vendor would have to repay the estate the $1,000; it would then have a corresponding unsecured claim against the estate for that same $1,000. But the vendor would be entitled to retain the remaining $4,000. *See* 11 U.S.C. §§ 547(b), 550(a), 502(h).

Notably, this is the same situation the vendor would have found itself in had it simply stopped doing business with the debtor after Transfer 2: it would have had to return that $1,000, and it would have had a $1,000 unsecured claim against

28

the estate based on Transfer 2.  It would have owed the estate no additional moneys as a clawback by the trustee for any preferences.  Yet, the debtor (and the estate it leaves behind) would be in a worse position had the vendor decided to abandon the debtor after Transfer 2.  Had that been the case, the debtor would not have received the $4,000 worth of future shipments of goods.  With those additional shipments, however, the debtor had additional goods that it could sell to its customers, and thereby potentially increase the size of the estate available at the time of the later bankruptcy filing.

Consider, moreover, the strong disincentives for a vendor to continue supplying an ailing customer with goods if the Trustee's position wins out.  Under the interpretation the Trustee gives the new-value defense, the vendor would have to return all of the payments it subsequently received for the new value it provided the debtor.  Were this the rule, a prudent vendor, sensing financial problems by the debtor, would be foolish to continue delivering goods to the debtor following Transfer 2.  *Cf. Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1091 (5th Cir. 1994) (noting that, without the protection of § 547(c)(4), "a creditor who continues to extend credit to the debtor, perhaps in implicit reliance on prior payments, would merely be increasing his bankruptcy loss").  Indeed, focusing on post-Transfer 2 events set out in the chart, not only would the vendor have to return the entirety of the payments it had received for goods it had delivered under the

29

Trustee's interpretation, but it would also be out $4,000 in the value of the goods it had provided the debtor:  $4,000 worth of goods that it could have to sold to another grocery store.

In short, were the Trustee's approach applicable, a sensible vendor should immediately cut off the debtor, which would likely hasten the latter's financial demise and his ensuing bankruptcy.  Yet, the bankruptcy estate would almost always be better off if a vendor continues to supply the debtor with goods to sell, and the new-value defense, as interpreted by Blue Bell, would encourage it to do so.

### 2.     Promoting equality of treatment among creditors

The Trustee argues that requiring new value to remain unpaid is necessary to ensure that short-term creditors like Blue Bell are treated the same as longer-term creditors whom the debtor did not repay during the preference period.  We disagree with the Trustee's suggestion that longer-term creditors will necessarily be worse off in the absence of a requirement that new value remain unpaid.

As explained above, if new value must remain unpaid, then short-term creditors will have an incentive to stop extending credit to the debtor as soon as they sense that the debtor might be experiencing financial difficulty.  As a result, such creditors might refuse to provide the debtor with the goods and services it needs to continue in business unless they receive payment in advance or on a COD

30

(cash on delivery) basis.  *See, e.g.*, 11 U.S.C. § 547(b)(2) (providing that, in order to constitute an avoidable preference, a transfer from the debtor to a creditor must be made on account of an antecedent debt); *see also id.* § 547(c)(1) (providing that a trustee may not avoid a contemporaneous exchange for new value).  The debtor would then be deprived of the valuable opportunity to receive credit in the form of money, goods, and services at a time when it may need such credit more than ever.  And, all else being equal, with the vendor ceasing any new deliveries, the estate is ultimately left in the same position it would have been in had this short-term creditor instead been permitted to rely on a subsequent-new-value defense without any requirement that new value remain unpaid.

Moreover, by encouraging creditors to continue extending credit to financially troubled debtors, § 547(c)(4) has the potential to help such debtors avoid bankruptcy altogether, an outcome that longer-term creditors would almost certainly choose.  We therefore find unpersuasive the Trustee's argument that it is necessary to require new value to remain unpaid in order to ensure that longer-term creditors are treated fairly in comparison with short-term creditors who extend new value to the debtor during the preference period.

## III.    Whether Transfers Avoidable as Preferences Under § 547(b), and on No Other Ground, Are "Otherwise Unavoidable" Under § 547(c)(4)(B)

In the alternative, the Trustee argues that even if subsequent payment by the debtor does not defeat the new-value defense, Blue Bell is still not entitled to assert

that defense because of another preclusion in § 547:  specifically, § 547(c)(4)(B).

Reading subsection (B) together with the other language of subsection (4), the

provision prohibits the trustee from undoing a transfer to the creditor where the

creditor has subsequently provided new value if, "on account" of this new value,

the debtor did <u>not</u> make "an otherwise unavoidable" transfer for the benefit of the

creditor.[15]

Admittedly, the double-negatives in the statutory language make for some

difficult parsing.  But to translate:  § 547(c)(4)(B) prevents the trustee from

undoing (avoiding) a transfer of money from the debtor to a creditor to the extent

that, after the transfer, the creditor gave new value to the debtor, unless the debtor

made an "otherwise unavoidable transfer" to the creditor "on account of" that new

value.  So, if the debtor paid for the new value with an "otherwise unavoidable

transfer," then the creditor cannot use that new value as a defense against the

trustee's attempt to avoid an earlier preference.  Conversely, if the debtor makes a

payment for the new value that is itself avoidable, then the creditor can avail itself

of the new-value defense.

Before attempting to articulate the Trustee's argument, it is helpful to step

back and examine the broader context of avoidance provisions within the

---

[15]  To repeat, § 547(c)(4)(B) provides in pertinent part:  "The trustee may not avoid under this section a transfer . . . to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor . . . on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."

32

Bankruptcy Code.  When a debtor files for bankruptcy, any transfer that the debtor made shortly before the filing naturally becomes the subject of skepticism, particularly for creditors who would receive more money from a pro rata distribution of the debtor's estate if those transfers had not been made.  For example, if a debtor with $100,000 in assets transferred all of those assets to a single creditor only days before filing for bankruptcy, leaving nothing available for his other creditors, those other creditors would naturally view that transfer suspiciously and seek a way to bring the money back into the estate so that they might receive a portion of it when the estate is distributed.

To prevent the inequity that could result if the debtor improperly favored some creditors over others shortly before filing for bankruptcy, and to promote "the prime bankruptcy policy of equality of distribution among creditors," *Wolas*, 502 U.S. at 161, the Bankruptcy Code allows a trustee  to "avoid"—that is, undo[16]— certain pre-bankruptcy transfers.  *See, e.g.*, 11 U.S.C. §§ 544(b), 547(b), 548(a).

For example, § 548(a) allows a trustee to avoid a fraudulent transfer.  A fraudulent transfer is one that was made within two years of the petition date in

---

[16]  Because we are dealing here with transfers of money in payment for goods received by the Debtor, and because the Trustee sought both avoidance of the transfers and recovery from Blue Bell in the same complaint, we need not concern ourselves with the distinction between avoidance and recovery for purposes of our analysis.  *See* 11 U.S.C. § 551 (providing that any transfer avoided by the trustee under certain sections of the Bankruptcy Code, including §§ 547 and 548, is "preserved for the benefit of the estate"); *id.* § 550(a) (providing that, after a transfer is avoided, the trustee may recover the property transferred or the value of that property from the initial transferee or a subsequent transferee).

which either (1) the debtor received less than a reasonably equivalent value in exchange for the transfer and was insolvent on the date that the transfer was made, *id.* § 548(a)(1)(B); or (2) the debtor made the transfer with the intent to hinder, delay, or defraud its creditors, *id.* § 548(a)(1)(A). *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888–89 (2018). No fraudulent transfers were alleged to have occurred in this case.

Under § 547(b), a trustee may avoid a transfer that constitutes a "preference."[17] *See, e.g.*, *Fid. Fin. Servs., Inc. v. Fink*, 522 U.S. 211, 214–17 (1998). As defined by § 547, a preference is any transfer made by the debtor within 90 days of the petition date if that transfer was made "for or on account of" an antecedent debt, was made while the debtor was insolvent, and enabled the creditor who received it to receive more than it would have otherwise received in a Chapter 7 liquidation. 11 U.S.C. § 547(b). The payments to Blue Bell by the Debtor are conceded to be preferences.

Yet, not all preferences will ultimately be avoidable by the trustee because the Bankruptcy Code creates defenses that a creditor may use to prevent the trustee from avoiding a preference payment made by the debtor. For example, if the "creditor" has provided "new value" to a debtor by selling the latter an item and

---

[17] And a trustee has other avoidance powers besides those described in §§ 547 and 548. For example, a trustee may also avoid certain post-petition transfers and set-offs, under §§ 549 and 553(b)(1), respectively.

34

receiving payment from the debtor in what constitutes a substantially contemporaneous exchange, then that transfer by the debtor to the creditor is not avoidable.  *See id.* § 547(c)(1).  A contemporaneous cash payment or COD delivery would be examples of this type of unavoidable preference.  There were no contemporaneous cash payments or COD deliveries in this case.

In addition, a payment by the debtor of debt incurred in the ordinary course of business, with the payment to the creditor being made according to ordinary business terms, is a type of preference that the trustee is not permitted to avoid. *See id.* § 547(c)(2).  Further, with certain qualifications, the trustee cannot avoid a transfer that creates a perfected purchase money security interest.  *See id.* § 547(c)(3).  Neither type of transfer is at issue in this case.  Finally,[18] we have debtor transfers followed by the providing of new value by the creditor, which is at issue in this case.  *See id.* § 547(c)(4).

With this context in mind, we now circle back to the Trustee's argument.  To repeat our earlier dissection of the pertinent statutory language, if the debtor paid for the new value with an "otherwise unavoidable transfer," then the creditor cannot use that new value as a defense against the trustee's attempt to avoid an earlier preference.  Conversely, if the debtor makes a payment for the new value that is itself avoidable, then the creditor can avail itself of the new-value defense.

---

[18]  There are other exceptions, not pertinent to this case, included in § 547(c).

In this case, the Debtor clearly made post-new value payments that were avoidable. After Blue Bell delivered ice cream (which constituted the new value for previous payments by the Debtor), the Debtor made payments that all agree satisfied the elements of a preference under § 547(b).

Thus, because such payments by the debtor constituted preferences, they were avoidable, meaning Blue Bell seemingly has the winning argument when it asserts that § 547(c)(4) prevents the Trustee from avoiding any payments to the extent they were followed by the delivery of goods of equivalent value.  The Trustee, however contends that because the statute uses the word "otherwise" in qualifying the unavoidable transfer that the debtor's payment cannot represent— "on account of which new value the debtor did not make an <u>otherwise</u> unavoidable transfer"—Blue Bell loses.  Why?  Well, the Trustee acknowledges that all of these payments by the Debtor were preferences under § 547, and hence avoidable.  But, says the Trustee, the "otherwise" qualifier means that the avoidability of a debtor's payment cannot be derived from § 547, but instead it must come from somewhere else.  The somewhere else would presumably be § 548, which prohibits fraudulent transfers, and which the Trustee uses as his example of an "otherwise avoidable" transfer that would be sufficient to allow a creditor to avail itself of the new-value defense under § 547(c)(4).

36

Of course, if correct, the Trustee's argument effectively eviscerates the new-value defense. Under his example, the creditor could take advantage of the defense only if the subsequent transfer by the debtor constituted a fraudulent transfer. But success in that endeavor would be a Pyrrhic victory because obviously the transfer would then be avoided as being fraudulent. In essence, the Trustee's argument largely renders § 547(c)(4) an empty set: not a result one would reasonably think Congress to have intended when it drafted this language.

Leaving aside the illogical end result of the Trustee's argument, we disagree with his interpretation of the statute. We read the phrase "otherwise unavoidable transfer" in § 547(c)(4)(B) as referring to transfers that are unavoidable for reasons other than § 547(c)(4)'s subsequent-new-value defense. Section 547(c)(4) excepts from avoidance transfers that otherwise meet all of the requirements for avoidance under § 547(b). In other words, § 547(c)(4) renders otherwise avoidable transfers unavoidable. The phrase "otherwise unavoidable transfer" in a provision that renders transfers unavoidable naturally means a transfer that is unavoidable for reasons other than that provision. Our interpretation is bolstered by the fact that § 547(c)(4) is only one exception to avoidability contained within a list of such exceptions. *See* 11 U.S.C. § 547(c)(1)–(9). Thus, a transfer that is rendered unavoidable by one of those other exceptions, such as § 547(c)(2)'s ordinary-

course-of-business defense, can naturally be said to be "otherwise unavoidable" for purposes of § 547(c)(4)(B).

We are not the first court to conclude that "otherwise unavoidable transfer" in § 547(c)(4)(B) means a transfer that is unavoidable for reasons other than § 547(c)(4). *Accord Phx. Rest. Grp., Inc. v. Ajilon Prof'l Staffing LLC (In re Phx. Rest. Grp., Inc.)*, 317 B.R. 491, 499–500 (Bankr. M.D. Tenn. 2004); *Boyd v. Water Doctor (In re Check Reporting Servs., Inc.)*, 140 B.R. 425, 431–32, 435–36 (Bankr. W.D. Mich. 1992); *see also Roberds, Inc. v. Boyhill Furniture (In re Roberds, Inc.)*, 315 B.R. 443, 470–74 (Bankr. S.D. Ohio 2004). With respect to the Trustee's particular interpretation of the statute, the Trustee acknowledges that no other court has adopted his reading of "otherwise unavoidable" in § 547(c)(4)(B). In fact, courts have rejected the Trustee's interpretation. *See, e.g.*, *In re Check Reporting Servs., Inc.*, 140 B.R. at 431–32, 435–36; *cf. In re IRFM, Inc.*, 52 F.3d at 233 (concluding that transfers avoidable as preferences under § 547(b) were not "otherwise unavoidable"). We likewise reject the Trustee's argument that transfers that are avoidable under § 547(b), and on no other ground, are "otherwise unavoidable" for purposes of § 547(c)(4)(B).

## CONCLUSION

The statement in *Jet Florida System* indicating that § 547(c)(4) requires new value to "remain unpaid" is dictum. We are therefore free to give fresh

consideration to the question of whether § 547(c)(4) requires new value to remain unpaid. Having analyzed that statute, we hold that § 547(c)(4) does not require new value to remain unpaid. Nor do we find the Trustee's argument based on § 547(c)(4)(B) to be meritorious. We therefore **REVERSE** and **VACATE** the bankruptcy court's judgment and **REMAND** for a new calculation of Blue Bell's preference liability.